IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

TROY BRADSHAW,

                Plaintiff,            Case No. 3:06 CV 2402

-vs-

                                        <u>MEMORANDUM OPINION</u>

GOODYEAR TIRE AND RUBBER
COMPANY, et al.,

                Defendant.

KATZ, J.

This matter is before the Court on Defendant Goodyear's motion to dismiss (Doc. 8) and Defendant Union's motion to dismiss (Doc. 13). This Court has jurisdiction pursuant to 28 U.S.C. § 1331. For the reasons discussed herein, Defendants' motions are hereby granted in part and denied in part.

**I. Background**

Plaintiff Troy Bradshaw worked at Defendant Goodyear Tire and Rubber Company's ("Goodyear") plant in Auglaize County, Ohio from May of 1998 until his discharge in August of 2005. He was a member of Defendant United Steelworkers Local 200L ("Union"), a labor organization and exclusive bargaining agent for the unit in which Plaintiff was employed.

Goodyear received a report from a female employee that Plaintiff "had made a big scene about her being with [a male] coworker, . . . called [him] names, and threatened to kill him. She further asserted that he kicked a piece of rubber at her as she was leaving." Arbitrator's Decision, Pl. Ex. Doc. 1-2 (pp. 7-19) at 3. Plaintiff "had been by her build machine several times and had sat where he could watch her work." *Id.* at 4. Further, Plaintiff allegedly said that if the male

employee "said anything to him [Plaintiff] would kick his ass in the parking lot," indicated that he had driven by the male employee's house, and threatened to "come in here with a gun." *Id.* Plaintiff alleges that supervisors, co-workers, and union officials and members called him derogatory names in reference to his mental condition, vandalized his locker, and painted his name in graffiti on the walls.

Goodyear discharged Plaintiff on the basis of its finding that he violated a zero tolerance policy that prohibits violence, threats of violence, sexual harassment, unwelcome sexual advances, and other similar conduct. Plaintiff filed and the Union processed a discharge grievance and requested an arbitration hearing, which was held before an arbitrator and included the presentation of witnesses and evidence by the Union on behalf of Plaintiff and by Goodyear. Goodyear did not produce "most of the [at least five] eyewitnesses whose statements were taken during the [c]ompany's investigation." *Id.* at 8. The Union objected to the statements as hearsay and as denying the opportunity to cross-examine witnesses. The Union's case included Plaintiff's testimony, but he did not deny the alleged actions or threats. He testified that "[t]here are some times you can't take someone who keeps harping at you, you get PO'd." *Id.* at 7. Plaintiff also stated that "he had been the target of harassment by way of graffiti and vandalism in his locker. He also asserted he is on medication." *Id.* He denied being a threat to anyone. The arbitrator found that Bradshaw was "preoccupied with [the female employee] and hostile about her relationship with" the male employee. *Id.* at 10.

The Union also called Union Division Chair Patrick Jackson, who testified that "he spoke with a number of people who worked in the area and no one had trouble with [Plaintiff]. He solicited and received seven statements from employees to this effect." *Id.* at 7. In an April 5, 2006 arbitration award in favor of Goodyear, the arbitrator found the following:

2

[Plaintiff's] credibility must be evaluated. He has previously been suspended for an instance of physical violence. However, neither during his testimony nor his interview was there any admission whatsoever of wrongdoing. There was no acknowledgment that other employees were concerned and there was no expression of any intent to change or to address co-workers' concerns about intimidation. There was no indication that [Plaintiff] had learned from his past mistakes. Rather, [his] testimony and interview demonstrated evasion of responsibility, unconcern about the perceptions of others and anger.

[Plaintiff's] statements evidence an unapologetic perception that he has a right to threaten others. He simplistically wrote off his talk of "kicking ass" as shop talk. He asserted he had been the target of harassment himself. [Goodyear] did not deny that [Plaintiff] had been the subject of bathroom graffiti and locker vandalism. These incidents were serious and would be upsetting to anyone. However, [Plaintiff's] reaction was openly hostile and retaliatory; he plainly stated there are times you "can't take" the harping, you get "pissed off" and "take stuff in a different direction." These statements accept retaliation and anger as appropriate and affirm a "right" to deal with others in anger when "pissed off." Taking "stuff in a different direction" implies a change of victim rather than a peaceful resolution.

There is no concept here of an employee working with [Goodyear] to address problems. Rather, the approach is one of alienated self-help. His rote denial of any capacity to be a threat to others or to aggress against anyone is belied by his prior discipline for doing just that. [Plaintiff] admitted he was "pissed off" by things that [the female employee] had said and indicated intolerance for accusations: "I'm not eating shit twice." He in no way denied kicking a piece of rubber towards [her], and did not take this allegation seriously at all. The evidence in this case must be viewed as a whole. At least seven employees gave statements that they had eye witnessed [Plaintiff] engaging in hostile or intimidating conduct. These statements are cumulative and substantiate each other. The reliability of such written statements is significantly enhanced by having multiple witnesses confirm the stated facts. The statements by those who witnessed no such conduct merely indicate they were not present during the events of concern.

The Union correctly asserts that much of [Goodyear's] evidence is flawed. However, [Goodyear] produced eyewitness testimony that [Plaintiff] was hostile and threatening, and that he stared at [the female employee] in a hostile and intimidating way. Further, [Plaintiff] himself exhibited undenied hostility during his interview. Most importantly, [he] does not deny drop kicking a piece of rubber towards [her], choosing instead to quibble over its color. Indeed, his response ("all we run is black rubber tracks") sidesteps the allegation so as to effectively constitute an admission. The conduct placed [the female employee] in imminent physical danger and was both hostile and intimating. Indeed, it constituted assault. This act is sufficient, standing alone, to warrant serious discipline action, even in the absence of prior progressive discipline.

Upon receiving multiple, redundant and substantiating reports of intimidation, [Goodyear] was duty-bound to take action to address employee concerns. Its investigation was thorough, and demonstrated that [Plaintiff] had

>  created a pervasively hostile and intimidating work environment. It has presented solid evidence that [he] intimidated and threatened co-workers. [He] had previously been suspended for violating the same policy. Under the circumstances, [Goodyear] accumulated enough evidence to warrant a finding of just cause.

*Id.* at 10-12.

Plaintiff filed a charge of disability discrimination with the Ohio Civil Rights Commission on October 18, 2005. The OCRC found no probable cause that the Union had discriminated against Plaintiff. Plaintiff filed the suit before this Court on October 4, 2006. Defendant Union filed a motion to dismiss the following claims of Plaintiff's complaint: Claim 1 - disability discrimination in violation of the Americans with Disabilities Act; Claim 3 - disability discrimination in violation of Ohio law; Claim 4 - state law public policy tort; Claim 7 - breach of duty of fair representation ("DFR"); Claim 8 - intentional infliction of emotional distress. Union Br. (Doc. 8) at 2. Defendant Goodyear filed a motion dismiss the following claims of Plaintiff's complaint: Claim 4; Claim 6 - breach of the collective bargaining agreement ("CBA"); Claim 8; and Claim 9 - state law negligent hiring and retention tort. Goodyear Br. (Doc. 13).

**II. Standard of Review**

No complaint shall be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45, (1957); *see also Pfennig v. Household Credit Servs.*, 295 F.3d 522, 525-26 (6th Cir.2002) (citing *Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 561 (6th Cir.1998)). When deciding a motion brought pursuant to Fed.R.Civ.P. 12(b)(6), the inquiry is essentially limited to the content of the complaint, although matters of public record, orders, items appearing in the record, and attached exhibits also may be taken into account. *Yanacos v. Lake County*, 953 F.Supp. 187, 191 (N.D.Ohio 1996). The Court's task is to determine not whether the complaining party will

prevail on its claims, but whether it is entitled to offer evidence in support of those claims. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). The Court must accept all the allegations stated in the complaint as true, *Hishon v. King & Spalding*, 467 U.S. 69, 73, 81 (1984), while viewing the complaint in the light most favorable to the plaintiff. *Scheuer*, 416 U.S. at 236. A court, however, is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

### III. Discussion

#### A. Claims 1 and 3: Disability Discrimination

The federal Americans With Disabilities Act ("ADA") prohibits a covered employer from "discriminat[ing] against a qualified individual with a disability because of the disability of such individual in regard to . . . the hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Plaintiff is qualified if, and only if, he can perform the essential functions of the job in question. The Court must give some deference to the employer's judgment in determining what functions of a job are essential. *Id*. An employer cannot discriminate against a qualified employee with a disability by not making reasonable accommodations, which accommodations for that employee's known limitations do not impose an undue hardship on the operation of the employer's business. 42 U.S.C. § 12112(a) & (b)(5)(A).

In order to establish a *prima facie* case of disability discrimination in the employment context, a plaintiff must allege and prove (1) that he is an individual with a disability; (2) that he is otherwise qualified for the position he seeks or holds; and (3) that he was excluded from the

5

position under circumstances that raise a reasonable inference of unlawful discrimination.  *See Pesterfield v. Tennessee Valley Auth.*, 941 F.2d 437, 441 (6th Cir. 1991) (citing *Southeastern Community College v. Davis*, 442 U.S. 397, 406, 99 S. Ct. 2361, 2367, 60 L. Ed. 2d 980 (1979)); *Ennis v. National Ass'n of Business & Educ. Radio., Inc.*, 53 F.3d 55, 58 (4th Cir. 1995).  When the plaintiff has established a *prima facie* case of discrimination, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its decision.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973).  Once the employer meets its burden, the burden shifts back to the plaintiff to prove that the legitimate reasons offered by the employer were not its true reasons, but were a pretext for discrimination.  *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 1093, 67 L. Ed. 2d 207 (1981); *see also Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1095 (6th Cir. 1996); *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990).

To be successful under a Title VII claim based upon discrimination regarding a union's representation, a plaintiff must establish the following:

> (a) the employer committed a violation of the collective bargaining agreement; (b) the union permitted the violation to go unrepaired, thereby breaching its own duty of fair representation; and (3) the union was motivated by [discriminatory] animus. *See Bugg v. International Union of Allied Indus. Workers, Local 507 AFL-CIO*, 674 F.2d 595, 598 n. 8 (7 Cir.), cert. denied, 459 U.S. 805, 103 S.Ct. 29, 74 L.Ed.2d 43 (1982).

*Vargas v. Hill*, 152 F.Supp.2d 315, 318-319 (S.D.N.Y. 2001); *Patterson v. United Steelworkers of America, Local 9*, Case No. 3:04-cv-7019, 2005 WL 1539264 at *2 (N. D. Ohio June 30, 2005).

It is also unlawful under Ohio law "[f]or any employer, because of the . . . disability . . . of any person . . . to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."  Ohio Rev.

6

Code § 4112.02(A). The Ohio Supreme Court has held that the coverage of § 4112.02(A) is identical to the coverage of federal law prohibiting discrimination in the employment context. Thus, evidence sufficient to support a finding of discrimination under federal law is necessary before a violation of § 4112.02(A) can be shown. *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St. 2d 192, 196, 421 N.E.2d 128, 131 (1981); *see also Little Forest Medical Ctr. of Akron v. Ohio Civil Rights Comm'n*, 61 Ohio St. 3d 607, 609-10, 575 N.E.2d 1164, 1167 (1991), *cert. denied*, 503 U.S. 906 112 S. Ct. 1263, 117 L. Ed. 2d 491 (1992); *El Grande Steak House v. Ohio Civil Rights Comm'n*, 99 Ohio App. 3d 557, 562, 651 N.E.2d 440, 444 (1994); *Twinsburg City Schools v. Ohio Civil Rights Comm'n*, 86 Ohio App. 3d 527, 529, 621 N.E.2d 591, 593 (1993). Accordingly, the Court will address Plaintiff's federal and state law claims together.

Plaintiff makes factual allegations in his complaint and memorandum of law that, if established to be true, could support a claim for disability discrimination against Goodyear, but not against the Union. He alleges that he had a mental disability in the form of depression, that Defendants were aware of the disability by virtue of medical information furnished to Defendants, and that when Defendants became aware of his depression, supervisors, co-workers, and union officials and members referred to him as "Prozac kid," destroyed his property, and sprayed his name in graffiti throughout the building. If, through discovery, these facts can be further established, Plaintiff may well be able to show that he is an individual with a disability, that he is otherwise qualified for the position he seeks or holds, and that he was excluded from the position under circumstances that raise a reasonable inference of unlawful discrimination.

However, Plaintiff is unable to show, on the facts alleged in the complaint, that the Union can be held liable for discrimination, because he cannot show that the Union breached its DFR or

that Goodyear breached the CBA. These reasons are discussed more fully below, and are justified by the same reasoning as that discussed in section III(B)(1) of this memorandum of law.

Therefore, Counts 1 and 3 are dismissed as to Defendant Union, but not with regard to Defendant Goodyear.

### B. Claims 4, 6, 7, 8, and 9: Labor Management Relations Act

#### 1. Claims 6 and 7: Section 301

Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, provides that suits against labor organizations "for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . , or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." 29 U.S.C. § 185(a). A hybrid § 301 action consists of two claims: breach of the CBA by the employer and breach of the DFR by the union. To recover against either the employer or the union a plaintiff must show both. *Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573 (6th Cir. 1994).

Here, even if the alleged facts are proven to be true, Plaintiff cannot establish a hybrid 301 claim against the defendants because he cannot show either a breach of the CBA by Goodyear or a breach of the DFR by the Union. The parties focus their arguments on whether the Union breached its DFR during arbitration. Plaintiff was fired for what the arbitrator fairly determined was a violation of the zero tolerance policy. The arbitrator saw, heard from, or heard of witnesses on both sides, including a statement that seven employees stated they had no problem working with Plaintiff. Plaintiff argues that the lack of the actual introduction of the seven witnesses or their statements by the Union during its representation constituted an arbitrary and perfunctory handling

8

of the hearing. The Union, however, offered the statement about the seven witnesses, and the arbitrator weighed that statement, but ultimately decided it was not strong enough to counter-balance the lack of Plaintiff's remorse and credibility during testimony, past incidents involving Plaintiff, and the statements of other witnesses.  There was, therefore, no breach of the DFR by the Union.  The parties do not adequately address whether Goodyear breached the CBA, but that point is now moot in light of the Court's finding that the Union did not breach its DFR.  Plaintiff's claims 6 and 7 are hereby dismissed.

### 2. Claims 4, 8, and 9: Preemption of State Law Claims

With regard to federal preemption of state law under section 301 of the LMRA, the Sixth Circuit has set forth the following principles:

> Section 301, by its terms, governs "[s]uits for violation of contracts between an employer and a labor organization...." 29 U.S.C. § 185(a). However, the Supreme Court has read section 301 expansively to include individual collective bargaining workers' claims. *See, e.g., Smith v. Evening News Ass'n*, 371 U.S. 195, 200-01, 83 S.Ct. 267, 270-71, 9 L.Ed.2d 246 (1962). The Court also has deduced that section 301 "authorizes federal courts to fashion a body of federal law for the enforcement" of CBAs. *See Textile Workers v. Lincoln Mills*, 353 U.S. 448, 451, 77 S.Ct. 912, 915, 1 L.Ed.2d 972 (1957). To ensure uniformity in this area of federal law, the Court has further concluded that " '[s]tate law does not exist as an independent source of private rights to enforce collective bargaining contracts.' " *Caterpillar Inc. v. Williams*, 482 U.S. 386, 394, 107 S.Ct. 2425, 2430, 96 L.Ed.2d 318 (1987). In this respect, section 301 constitutes an exception to the well-pleaded complaint rule because "the pre-emptive force of § 301 is so powerful as to displace entirely any state cause of action 'for violation of contracts between an employer and a labor organization.' " *Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 23, 103 S.Ct. 2841, 2853, 77 L.Ed.2d 420 (1983). "State law is thus 'pre-empted' by § 301 in that only the federal law fashioned by the courts under § 301 governs the interpretation and application of collective-bargaining agreements." *United Steelworkers of America v. Rawson*, 495 U.S. 362, 110 S.Ct. 1904, 1909, 109 L.Ed.2d 362 (1990).
>
> The preemptive reach of section 301, however, is by no means boundless. Section 301 preempts only state law claims that are "substantially dependent on analysis of a collective-bargaining agreement," *see, e.g., International Bhd. of Elec. Workers v. Hechler*, 481 U.S. 851, 859 n. 3, 107 S.Ct. 2161, 2166-67 n. 3, 95 L.Ed.2d 791 (1987), not claims that only "tangentially" involve CBA provisions.

9

> *See, e.g., Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211, 105 S.Ct. 1904, 1911, 85 L.Ed.2d 206 (1985). Furthermore, a defendant's reliance on a CBA term purely as a defense to a state law claim does not result in section 301 preemption. *See Caterpillar*, 482 U.S. at 399, 107 S.Ct. at 2433; *accord Smolarek v. Chrysler Corp.*, 879 F.2d 1326, 1334 (6th Cir.) (en banc), cert. denied, 493 U.S. 992, 110 S.Ct. 539, 107 L.Ed.2d 537 (1989). Underlying these basic rules is the fundamental precept that "§ 301 preemption merely ensures that federal law will be the basis of interpreting collective-bargaining agreements, and says nothing about the substantive rights a State may provide to workers when adjudication of those rights does not depend upon interpretation of such agreements." *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 409, 108 S.Ct. 1877, 1878, 100 L.Ed.2d 410 (1988) (footnote omitted). Accordingly, whenever a plaintiff's state law claim "can be resolved without interpreting the [CBA] itself, the claim is 'independent' of the [CBA] for § 301 preemption purposes." *Id.* at 410, 108 S.Ct. at 1878 (footnote omitted). Applying these principles, we must analyze six of the plaintiffs' state law claims to determine which, if any, are preempted by section 301.

*Fox v. Parker Hannifin Corp.*, 914 F.2d 795, 799-800 (6th Cir. 1990).

> To determine whether a state-law claim is sufficiently "independent" to survive § 301 preemption, this court has adopted a two-step inquiry. [*DeCoe v. General Motors Corp.*, 32 F.3d 212, 216-17 (6th Cir. 1994).] First, courts must determine whether resolving the state-law claim would require interpretation of the terms of the collective bargaining agreement. If so, the claim is preempted. Second, courts must ascertain whether the rights claimed by the plaintiff were created by the collective bargaining agreement, or instead by state law. *Id.* at 216. If the rights were created by the collective bargaining agreement, the claim is preempted. In short, if a state-law claim fails either of these two requirements, it is preempted by § 301.

*Mattis v. Massman,* 355 F.3d 902, 906 (6th Cir. 2004).

### a. Claim 4: Public Policy Tort

Ohio's cause of action for termination in violation of public policy applies to at-will employment – not employment governed by a union-backed CBA. *Haynes v. Zoological Society of Cincinnati*, 73 Ohio St.3d 254 (Ohio 1995). Plaintiff is a union member, but asks this Court to extend the state public policy tort to his circumstances. Even though this cause of action is not necessarily preempted by federal law, this Court is unwilling to extend the at-will public policy

10

exception to Plaintiff's situation. *Lawrence v. Dixon Ticonderoga Co.*, 305 F.Supp.2d 806, 811-12 n.1 (N.D. Ohio 2004)..

### b. Claims 8 and 9: Emotional Distress and Negligent Hiring

On the other hand, the state law claims alleged in claims 8 (intentional infliction of emotional distress) and 9 (negligent hiring and retention) are preempted by federal law. The Sixth Circuit and this District have already held that claims for intentional infliction of emotional distress are preempted in situations similar to Plaintiff's. *Mattis*, 355 F.3d at 908 ("[D]etermining whether [the] alleged harassment constituted 'outrageous conduct' would force [the Court] to look to the CBA.") (citing *DeCoe*, 32 F.3d at 216); *Lawrence*, 305 F.Supp.2d at 812-13.

With regard to claim 9, this Court is of the opinion that claims for negligent hiring, retention, and supervision are preempted by section 301. The elements of a negligent hiring or retention claim in Ohio are: "(1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing the plaintiff's injuries; and (5) the employer's negligence in hiring or retaining the employee as the proximate cause of plaintiff's injuries." *Bush v. American Honda Motor Co., Inc.*, 227 F.Supp.2d 780, 801 (S.D.Ohio 2002) (quoting *Steppe v. Kmart Stores*, 136 Ohio App.3d 454, 737 N.E.2d 58, 66 (1999)); *Smith v. ABN AMRO Mortg. Group, Inc.*, Case No. 1:06-cv-45, 2007 WL 950334 (S.D. Ohio Mar. 27, 2007). Most elements of this claim make reference in some way to the employer-employee relationship or the status of each party as an employer or employee. The employer-employee relationship in this case is governed entirely by the CBA. There is no way to apply these elements to the facts of this case without interpreting the CBA. This Court agrees with its sister court in this District, which held:

> [The plaintiff's negligent hiring claim] is preempted by section 301 because the duties and rights forming the basis of this claim are created by the CBA and proof of this claim would require this court to interpret the CBA. This court's holding in *Morris* is particularly applicable to this claim. In *Morris*, this court noted that a plaintiff in a negligent hiring and supervision claim had the burden of establishing that the defendant had a duty or obligation to the plaintiff. [*Morris v. Ambassador Nursing Home, Inc.*, 845 F.Supp. 1164, 1167 (E.D. Mich. 1994).] Because any duty relating to the hiring, supervision or retention of employees in the collective bargaining context would arise solely from the collective bargaining agreement, resolution of these types of claims would require interpretation of that agreement.

*Weatherholt v. Meijer Inc.*, 922 F.Supp. 1227, 1233 (E.D. Mich. 1996). Resolving the state law claim would necessarily involve an analysis of the employer-employee relationship, which would in turn require analysis of the CBA. The rights arising out of the negligent hiring, retention, and supervision claim were created by the CBA.

## IV. Conclusion

For the reasons discussed herein, Defendants' motions to dismiss (Doc. 8, 13) are granted in part and denied in part. Plaintiff's claims 1 and 3 are dismissed with regard to Defendant Union, but dismissal is denied with regard to Defendant Goodyear. Plaintiff's claims 4, 6, 7, 8, and 9 are dismissed.

IT IS SO ORDERED.

    s/ *David A. Katz*
DAVID A. KATZ
U. S. DISTRICT JUDGE